FILED

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

98 NOV 12 AM 9: 43

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| PAT BUTLER, | ] | |
| Plaintiff, | ] ] ] | |
| vs. | ] ] | CV 97-N-2227-S |
| BIRMINGHAM JEWISH COMMUNITY CENTER, | ] ] ] | |
| Defendant. | ] | |

ENTERED
NOV 12 1998

## Memorandum of Opinion

### I. Introduction.

In this suit, the plaintiff, Pat Butler, brings suit against the Birmingham Jewish Community Center (hereinafter "the Center") for violations of the Equal Pay Act, 29 U.S.C. § 206(d), and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq*. Specifically, Butler claims that while employed at the Center she was paid less than her male replacement and that she was terminated because of her age and replaced by a younger woman.

This matter is presently before the court on the defendant's motion for summary judgment, filed September 30, 1998. The issues have been briefed by the defendant. By order dated September 25, 1997, this court fixed a briefing schedule for summary judgment motions. The deadline for plaintiff to respond to the defendant's motion has now passed. Accordingly, the motion is ripe for decision. Upon due consideration, the motion will be granted.

26

**II.     Statement of Facts.**[1]

Butler was hired by the Birmingham Jewish Community Center in June 1979. (Complaint, p. 2; see also Exhibit # 2, deposition of Garth Potts, p. 66). Butler was initially hired as an office "go-for," but was promoted to executive secretary, that is, secretary to the Center's executive director, after approximately six months on the job. (See Exhibit # 3, deposition of Pat Butler, pp. 37, 45, 47). Sometime in 1980 or 1981, after serving approximately six to nine months as executive secretary, Butler moved to the business office and took an accounts receivable position. (Butler, pp. 48, 49, 55). In January 1981 or 1982, Butler was promoted to manager of the business office. (Butler, pp. 57, 59). Butler remained in her position as manager of the business office throughout the course of her full-time employment with the Center. (Butler, p. 68). Throughout her employment with the Center, Butler met the applicable job qualifications and performed her job in a manner generally satisfactory to the Center. (Complaint, p. 2; see also Exhibit # 2, deposition of Garth Potts, p. 66).

Butler's duties as business office manager included supervising the front desk receptionists, the bookkeeper, the accounts receivable clerk, and the secretaries. Her bookkeeping duties included the United Way budgets, the annual budget projections for the Center, payroll, personnel records, and employee benefits, vacations, and sick time.

---

[1] The facts set out below are gleaned from the defendant's submission of undisputed facts in support of the summary judgment motion. Because plaintiff failed to respond to these facts, they are deemed admitted for summary judgment purposes. See *Initial Order*, September 25, 1997, at 4; see also *FTC v. Febre*, 128 F.3d 530, 535-36 (7th Cir. 1997). The court notes that these facts are amply supported by the record, and particularly by the evidence submitted by the defendant in conjunction with the summary judgment motion. However, these are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

2

Butler also was responsible for the general ledger, quarterly taxes, and year-end reports. (Butler, p. 113).

During the 1980s, the Center experienced rapid growth in its early childhood department and in the Center's total membership. (Butler, pp. 89, 90; Potts, p. 61). Membership grew from around 1000-1200 members to almost 2,000 members in 1996. (Butler, pp. 89, 90; Potts, p. 61). Garth Potts was hired as the Center's executive director in March, 1991. (Butler, p. 115; Potts, p. 6). In 1992, the Center considered a huge financial drive to renovate and update the Center's facilities, and to add space. (Butler, pp. 105, 106). The large scale renovation project was begun in 1993. (Potts, p. 61).

In 1995, Butler agreed to go part-time with the Center effective January 1996. (Butler, pp. 206, 207). Butler's decision to work part-time for the Center was voluntary, as she wanted to spend more time with her retired husband. (Butler, p. 204). Butler wanted her part-time position to be guaranteed by the Center for at least 3 to 5 years until she qualified for social security and/or medicare benefits. (See Exhibit # 4, Butler memo dated 12/20/95; Butler, pp. 273, 274). Potts explained to Butler that no such guarantee could be made. (See Exhibit # 5, Potts memo dated 12/29/95; Potts, pp. 105, 110; Butler p. 211). Potts acknowledged that Butler wanted long term job security, but explained that he could not make such a commitment to her or to anyone at the Center. (Potts, pp. 105, 110).

Sometime in January 1996, shortly after moving to her part-time position, Butler received a memo dated December 29, 1995 in which the Center outlined the parameters of her employment. (Butler, p. 226). The memo stated that her part-time position was

3

"conditional on maintaining a mutually productive working relationship." (Exhibit # 5). Butler never questioned the memo or discussed it with Potts. (Butler, pp. 275, 276).

After Butler informed the Center that she was planning to leave her full-time position, the Center made the decision to replace or upgrade Butler's position to that of a full Controller. (See Exhibit # 6, Center's Response to the EEOC's Request for Information, p. 3, answer 7; Potts, p. 63). The decision to change to Controller was made between the second and fourth quarters of 1995. (Potts, p. 62).

As a part-time employee, Butler relinquished her supervisory role, but retained her other basic bookkeeping duties. (Butler, pp. 213, 215, 216). Because she was only working part-time, Butler was unable to complete all the work she normally did in her full-time position. (Butler, pp. 213, 215, 216). Other employees performed the work Butler could not get to because of the time restraints of working part-time. (Butler, pp. 213, 215, 216).

In January 1996, the Center hired Andy Refsnider as its new Controller. (Butler, pp. 245, 246). A personality conflict began to develop between Refsnider and Butler as Butler tried to teach Refsnider what she knew about the Center's bookkeeping procedures. (Butler, pp. 245-248). Potts testified that Butler was often frosty or off-putting when having to point out the mistakes of others, and stated that Butler could have been more gentle in this regard. ( Potts, pp. 66, 67).

During the 1996 year, the Center encountered financial difficulties. (Exhibit # 6, p. 3, answer 7; Potts, pp. 54, 55). Because of these financial difficulties, the Center decided to make a cutback in the budget. (Exhibit # 6, p. 3, answer 7). In response to the budget cutback, Refsnider informed the Center that he could operate without Butler's part-time

4

position. (Exhibit # 6, p. 3, answer 7). Butler and Refsnider's working relationship deteriorated throughout 1996. (Butler, pp. 245 - 248). Butler suspected that Refsnider was unhappy with her, and wanted to get rid of her. (Butler, p. 255). Because of this conflict with Refsnider, Butler suspected that her part-time position might be in jeopardy. (Butler, p. 254). Butler testified that she confronted Potts with her suspicions, and Potts indicated that the Center would probably eliminate her position at the end of the 1996 year. (Butler, pp. 254, 255).

Butler testified that she applied for a full-time position with the Center as staff accountant shortly after Potts confirmed her suspicions. (Butler, p. 253). Butler further testified that Refsnider told her she was not qualified for the job. (Butler, p. 254). Refsnider was not one of the individuals whom Butler believed held a bias against women or older people. (Butler, 198, 199, 227).

Butler's part-time position was eliminated on September 26, 1996, and Butler's employment with the Center was terminated that same day. (See Exhibit # 7, Termination Letter; Butler, pp. 252).

**Butler's Equal Pay Act Claim**

From 1984 to 1991, Eli Estreicher served as the Center's executive director. As executive director, Estreicher was Butler's direct supervisor. (Butler, pp. 81, 85, 93, 94). Butler had very positive feelings about Estreicher, was comfortable working for him, and described him as supportive and a good friend. (Butler, pp. 102, 103). Butler did not perceive discrimination of any kind at the Center until after Potts became executive director in March 1991. (Butler, p.121). Butler testified that prior to 1992 she never got less

5

than an annual five percent raise increase, and usually it was a little more than that. (Butler, p. 100).

Butler contends that the provisions of the Equal Pay Act were violated because Refsnider's annual salary as Controller ($32,500) was higher than her annual salary ($29,494) as full-time manager of the business office. (Butler, pp. 199, 200; Complaint, p.2; Exhibit # 7, p. 4, answer 7). Refsnider held a Bachelor of Science degree in Accounting from Glassboro (N. J.) State, and had seven years of accounting experience. Both of his previous jobs involved direct experience with non-profit agencies. (Exhibit # 7, p. 3, answer 7; Butler, p. 61). Butler's education was limited to a high school diploma and some business course work. (Exhibit # 7, p. 3, answer 7). The position of Controller involved duties and responsibilities which were not part of Butler's job as full-time manager of the business office. (Potts, pp. 11-13, 61, 63).

By the end of 1995, the Center had grown dramatically owing in part to the large scale renovation project undertaken in 1993. (Exhibit # 7, p. 3, answer 7). The Center now had almost 275 full- and part-time employees, and a $ 3,000,000 budget over the course of a year. (Exhibit # 7, p. 3, answer 7). The Center created the position of Controller because it felt that someone was needed with both an accounting degree and with experience who would be more proactive in terms of management and other responsibilities of the job. (Potts, p. 61). The Controller position differed from the full-time position held by Butler in the following ways: (1) greater demands on the Controller for interaction with the board of directors and with the treasurer in terms of pulling together and presenting reports, (2) greater demands on the Controller for analysis in proactively making or recommending

6

decisions about how the Center handled money, and (3) greater input from the Controller on the management of the budget. (Potts, p. 63). The executive director also relied to some degree on the Controller to insure compliance with state and federal discrimination laws. (Potts, pp. 11-13). Butler never saw Refsnider's resume, and had no knowledge of his experience or training. (Butler, pp. 199-201). Butler does not know what Refsnider's duties and added responsibilities were as Controller. (Butler, p. 202).

The Center paid Butler the same rate of pay ($14.18 per hour) in her part-time position as in her full-time position, despite Butler's reduced duties and responsibilities. (Exhibit # 7, p. 4, answer 7). Butler alleges that the males on the Center's management team received higher percentage raises than their female counterparts after Potts' arrival in 1991. (Potts, pp. 128-132), but she has not produced any documentary evidence, such as payroll records, to support her allegation of higher raises for male employees. Butler has also not produced any evidence, documentary or otherwise, to show that the particular male and female employees to which she refers performed "equal work" on jobs which required equal skill, effort, and responsibility, and which were performed under similar working conditions.

Pay increases at the Center were based on annual evaluations, budget allowances, the financial position of the agency, and changes in the job description of the employee. (Potts, pp. 47, 51). With one or two exceptions, the pay scales of both female and male managers at the Center were in line with what was recommended by the Jewish Community Center Association's national averages. (Potts, pp. 40-42). The Center hired the accounting firm of Marshall, Hendon, Minter, and Associates, Inc. to perform a statistical

7

analysis of the Center's payroll and employment data. (See Exhibit # 8, Analysis of Employment Data, Jewish Community Center). The Marshall firm found that the Center's average wage growth for all female employees of the Center with 2 or more years of employment was 7.205% while the average wage growth for males with at least 2 years of employment was 6.779%. In regards to the professional and managerial employees, the average wage growth for females with at least 2 years of employment was 8.185% compared to only 5.422% for males. (Exhibit # 8, p. 6). The Marshall firm concluded that there was no indication from the Center's employment data and payroll records that the Center discriminated against any employee based on sex or age. (Exhibit # 8, p. 9).

**Butler's Age Discrimination Claim**

Butler was born on October 25, 1939, and was approximately 57 years old when the Center eliminated her part-time position. (Butler, p. 7; Complaint, p. 2). Butler alleges that she was replaced by a female younger than 40 years old. (Complaint, p. 2). Butler was not replaced at the Center. Her part-time position was neither restored nor refilled. (Exhibit # 7, p. 4, answer 7).

Butler testified that on one occasion, she and Potts were interviewing for some front desks receptionists, and Potts told her that he wanted to project a young image for the Center. (Butler, p. 195). Butler did not question Potts about this statement, nor did Potts elaborate further. (Butler, p. 195). Butler also testified that she heard some of the younger members of the board, during the renovation of the Center in 1993, state that they wanted to project a young, fit image with all visible people. (Butler, p. 198, 199). Butler testified that no other individuals at the Center have indicated a bias against older people. (Butler, pp.

8

198, 199). Butler testified that she does not believe the Center as an organization discriminates against people based on their age. (Butler, pp. 227, 228). She also testified that it was not the common practice of the Center to discriminate based on age. (Butler, pp. 227, 228). One employee, Dorothy Levy, worked for the Center until she was seventy years old. (Butler, pp. 43, 44). Levy voluntarily retired shortly before Butler was terminated. (Butler, pp. 43, 44).

The Marshall firm analyzed the Center's employment data based on age to determine if age discrimination was a factor in wage growth. (Exhibit # 8, pp. 8, 9). The firm found no significant difference in wage increases based on age, and concluded that the Center did not discriminate against any employee based on age. (Exhibit # 8, pp. 8, 9). The Marshall firm included the following testimony in its report:

> Pat Butler has alleged that she was discriminated against. Her wage history was reviewed and compared to the other JCC employees and to some national data. Pat Butler enjoyed a compound annual rate of growth in her wage of 10.5% for the 17 years she worked at JCC. Of the 52 employees with more than two years of service only 6 had a higher rate of growth in their wage while employed at JCC. When Pat Butler's first 6 years of employment are compared to this group she has a higher average than any of these six. Of the six employees who did have a higher annual average rate of growth 4 were female and 3 were male. Their ages ranged from the 20's to the 60's. Pat Butler's wage increases for the years she worked at JCC were among the highest of any employee, male or female, young or old.
>
> The Bureau of Labor Statistics publishes data on wages for employees by industry and occupation. From this publication the job classification that was closest to Pat Butler was "Persons in Accounting, Auditing, and Bookkeeping". This data from 1978-1997 was used to make a comparison with Pat Butler. The data are given in Exhibit 22. As indicated by the Exhibit the average increase nationally for persons in this occupation was 4.35 %. During the same time period Pat Butler had a rate of growth that was two and half times greater, at 10.5 %.

9

(Exhibit # 8, p. 9).

## III. Summary Judgment Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Id.* at 324. "[T]he plain language of Rule

10

56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the nonmovant has properly responded to a motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11(1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented

11

through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## IV. Discussion.

Butler has alleged violations of both the Equal Pay Act and the Age Discrimination in Employment Act. The court will address each of these contentions in turn.

The Equal Pay Act (hereinafter "the EPA"), codified at 29 USC § 206(d), reads in pertinent part as follows:

> (1) No employer having employees subject to any provisions of this section shall discriminate . . . between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions . . .

A prima facie case under the Equal Pay Act is established when the plaintiff shows (1) the employer pays different wages to employees of opposite sexes for equal work, and (2) the jobs in question require equal skill, effort, and responsibility, and are performed under similar working conditions. *Beavers v. American Cast Iron Pipe Co.*, 975 F.2d 792, 801 (11th Cir. 1992); *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S. Ct. 2223, 2228, 41 L.

12

Ed. 2d 1 (1974). Once a prima facie case is made, the employer must prove that the wage differential is justified by one of the statutory exceptions set forth in the EPA. *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995). The plaintiff must then rebut the explanation by showing that it is pretextual or merely a "post-event justification." *Irby*, 44 F.3d at 954.

Here, plaintiff has not established a prima facie case. Butler has produced no evidence that the Center paid females less than it paid males for equal work. She has not subpoenaed or evaluated the payroll records of the Center and has offered no evidence to support her assertion that male managers at the Center received higher pay raises than their female counterparts. Plaintiff's assertions are actually in conflict with the findings of the accounting firm of Marshall, Hendon, Minter, and Associates, Inc., who performed a statistical analysis of the Center's payroll, personnel, and employment data in an attempt to determine if any type of sex discrimination had occurred in regard to wages. The Marshall firm found that females with at least two years of employment actually received higher wage increases than the males (7.205% as compared to 6.770%). When the study group was narrowed to include only the professional and managerial staff, the discrepancy in favor of females increased (8.185% as compared to 5.422%). The Marshall firm concluded that there was no indication from the Center's employment data that the Center discriminated against any employee on the basis of sex or age.

Moreover, Butler has produced no evidence that the jobs in question required equal skill, effort, and responsibility, and were performed under similar working conditions. Butler contends that the EPA was violated because Refsnider's annual salary as Controller exceeded her salary as office manager by approximately three thousand dollars. However,

13

it is undisputed that Refsnider had a higher educational background than Butler which included a Bachelor of Science in Accounting and seven years of accounting experience, and that the position of Controller involved greater duties and responsibilities than Butler's office manager job, and in general, was a more proactive position.

The Age Discrimination in Employment Act (hereinafter "the ADEA"), codified at 29 U.S.C. § 623, states in pertinent part:

> (a) Employer practices. It shall be unlawful for an employer—(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.

A plaintiff may establish a prima facie case in one of three ways: (1) by presenting direct evidence of discriminatory intent; (2) by meeting the burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); or (3) by demonstrating through statistics a pattern of discrimination. *See Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1457 (11th Cir. 1997). "Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact without inference or presumption." *Carter v. City of Miami*, 870 F.2d 578, 581–82 (11th Cir. 1989) (citations omitted). "[O]nly the most blatant remarks, whose intent could be nothing more than to discriminate . . . constitute direct evidence of discrimination." *Id.* at 582. In the present case, Butler has presented no direct or statistical evidence of discrimination by the defendant. Therefore, she must establish a prima facie case of discrimination, if at all, through circumstantial evidence.

Under *McDonnell Douglas*, the plaintiff is required to demonstrate that she (1) was a member of the protected group of persons between the ages of forty and seventy, (2)

14

was subject to adverse employment action, (3) was replaced with a person outside the protected group, and (4) was qualified to do the job. *Jameson v. Arrow Co.*, 75 F.3d 1528, 1531 (11th Cir. 1996). In cases involving a reduction in work force, or where the position is eliminated in its entirety, these criteria are altered slightly. In these instances, "the plaintiff establishes a prima facie case under the ADEA by demonstrating (1) that she was in a protected age group and was adversely affected by an employment decision, (2) that she was qualified for her current position or to assume another position at the time of discharge, and (3) evidence by which a fact finder could reasonably conclude that the employer intended to discriminate on the basis of age in reaching that decision." *Jameson*, 75 F.3d at 1532.

Butler has failed to establish a prima facie case under the ADEA because she cannot meet the third prong of the *McDonnell Douglas* test. Butler has not produced any evidence that the Center intended to discriminate on the basis of age when it made the decision to eliminate her part-time position. Butler originally alleged that she was replaced by a female younger than 40 years old, but failed to produce any evidence to support this allegation. The undisputed evidence indicates that Butler was in fact not replaced by anyone. Butler's part-time position was eliminated, and her position has not been restored or refilled.

The only evidence Butler could produce to support her charge of age discrimination were certain statements allegedly made by Potts and some of the board members three years prior to her termination. During the 1993 renovation of the Center, Butler testified that Potts and some of the younger board members made a comment that they wanted to project a young, fit image for the Center with all visible people. Butler has not produced

15

any evidence to show that these alleged statements, made three years prior to her termination, were in any way connected to the elimination of her part-time position with the Center. Indeed, one of the plaintiff's co-employees, Dorothy Levy, worked for the Center until she was seventy years old with no complaints.

Butler has not produced any evidence which would allow the trier of fact to reasonably conclude that age was a motivating factor in the Center's decision to eliminate her position. Butler conceded that she does not believe the Center as an organization discriminates against individuals based on their age and testified that it was not the common practice of the Center to discriminate based on age. The Marshall firm analyzed the Center's employment data and concluded that the Center did not discriminate against employees based on age. The undisputed evidence indicates that Butler's position was eliminated because of budget cutbacks made necessary when the Center suffered a bad financial year.

Given these facts, the Center has certainly carried its burden under Fed. R. Civ. P. 56. *Celotex*, 477 U.S. at 322-23. The plaintiff has not even responded to the Center's presentation, much less succeeded in "designat[ing] 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). Therefore, this court concludes that there is no genuine issue of material fact and the defendant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The defendant's summary judgment motion is due to be granted.

16

## V.     Conclusion.

Accordingly, the defendant's motion for summary judgment will be granted. The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this __10th__ of November, 1998.

                                                                    _____
                                                                    EDWIN L. NELSON
                                                                    UNITED STATES DISTRICT JUDGE

17